TENNESSEE OIL CO. *v.* McCANLESS, Com'r of Finance
and Taxation.

(*Nashville*, December Term, 1941.)

Opinion filed December 13, 1941.

BRYAN & MAXWELL, of Memphis, and LEVINE & LEVINE, of Nashville, for Tenn. Oil Co.

ROY H. BEELER, Attorney-General, and WILLIAM F. BARRY and HARRY PHILLIPS, Assistant Attorneys-General, for McCanless.

MR. JUSTICE DeHAVEN delivered the unanimous opinion of the Court on one phase of the case, and a dissenting opinion as to the other phase.

Complainant, a Tennessee corporation engaged in the business of distributing gasoline and other petroleum products, with its principal place of business at Dyersburg, Tennessee, seeks by its bill herein to recover $25,510.51 gasoline tax paid by it under protest. The chancellor granted the relief sought and defendant has appealed to this court and assigned errors.

(1) DISSENTING OPINION.

(1) The first question presented for determination is the liability of complainant for the seven cent tax on gas-

oline sold by it to E. R. Moody and Thomas Browder.

Section 1140 of the Code of Tennessee as amended by Chapter 130, Public Acts 1933, is as follows:

"Gasoline or distillate not previously the subject of an original sale in this State, stored in this State for export to points outside the State, shall not be included in the measure of the tax liability of any distributor or dealer; provided that such gasoline or distillate is stored in a separate tank marked 'export tank'; Provided that a bond is executed by the distributor or dealer that in the opinion of the Commissioner of Finance and Taxation adequately protects the State against loss of tax in case said gasoline or distillate is not subsequently exported outside the State; Provided that gasoline or distillate stored for export longer than a period of sixty days must be included in the measure of the tax liability of the distributor or dealer so storing such gasoline or distillate."

Gasoline or distillate stored in conformity with the provisions of the above statute "for export . . . outside the state" is specifically excluded from the measure of the tax. *Texas Company* v. *McCanless, Commissioner,* 177 Tenn., 238, 148 S. W. (2d), 360. Admittedly, the gasoline sold Moody and Browder was from complainant's export tank and was intended by both complainant and the two purchasers for export outside the State of Tennessee.

Within the sixty-day period fixed by the statute, complainant sold gasoline, tax free, to Moody and Browder and delivered the same from its export tank into trucks of the purchasers, with the understanding that the gasoline sold Moody would be transported by him to Cottonwood Point, Missouri, to be sold there, and that the gasoline sold to Browder would be transported by him

to his bulk station in Kentucky and sold there. The evidence shows, without contradiction, that Moody and Browder did, in fact, transport the gasoline by the trucks into which it had been loaded at complainant's export tank, to the respective points in Missouri and Kentucky and then sold after the payment of the gasoline tax imposed by the respective states.

The contention of the state, in brief, is that Code 1140, as amended, should be construed to exempt sales only when exported by the storer in railroad tank cars, common carrier by truck, or by the storer's own tank trucks. The language of Code, sec. 1140, as amended, is not, in my opinion, susceptible of such construction. There is nothing in the statute that can properly be construed as requiring that the gasoline sold from out of the export tank be transported out of the state in any particular manner, or by vehicle of any particular character or ownership. It is competent, under the statute, for the storer to consummate a sale of gasoline at the export tank for export outside the state by the purchaser. In such case, the purchaser can make his own choice of the method of transportation. The fact that he elects to transport the gasoline in his own trucks is immaterial. What the statute requires is that the gasoline be exported to points outside the state within sixty days in order that it shall not be included in the measure of the tax. Under the statute, the storer is required to give a bond to protect the state against loss of tax in case the gasoline is not exported outside the state.

It seems clear to me that if gasoline sold from the export tank be transported by the purchaser, by any method whatsoever, from the export tank to a point outside the state, there is full compliance with the requirements of the statute. The ownership of the vehicle

in which the transportation is had is immaterial and of no importance.

The basis of defendant's contention that gasoline cannot be sold tax free to a purchaser for export outside the state in trucks belonging to the purchaser, is that such method of transportation opens the door to fraud, in that the purchaser might not transport the gasoline outside the state, or that he might transport the gasoline out of the state and then bring it back into this state for sale here. The same opportunity for fraud can be imagined regardless of the ownership of the vehicle used in the transportation of the gasoline. It is not claimed that Moody and Browder practiced such fraud or that anybody else has. If, however, such fraud could be perpetrated, it would not warrant the court in amending the statute by reading into it a provision that exporting of the gasoline outside the state had to be by means of a common carrier, or by vehicles owned by the storer.

Counsel for defendant lean heavily on the case of *Superior Oil Co.* v. *Mississippi*, 280 U. S., 390, 50 S. Ct., 169, 74 L. Ed., 504. The question in that case was whether or not the gasoline on which the tax was claimed was moving in interstate commerce. The case is not in point with the case at bar. Here the question of complainant's liability for the tax depends for its solution upon the construction of Code, sec. 1140, as amended. Other cases relied on by defendant are inapplicable for the same reason.

The legislature doubtless understood the advantage to Tennessee in building up a commerce in gasoline in the state, and realized that if gasoline exported from Tennessee to points outside the state to be taxed both in Tennessee and in the state in which it was received and finally distributed to consumers that it would be impos-

sible to have any gasoline distributing business in Tennessee at all. Therefore it was enacted that the storer of gasoline should not be taxed on such gasoline as was sold for export and actually exported.

It is my opinion that complainant is not liable for the tax on the gasoline sold Moody and Browder and that the decree of the chancellor should be affirmed.

UNANIMOUS OPINION.

(2) Sales of gasoline to Obion County Board of Education. The chancellor found that material facts with reference to these sales to be as follows:

"'Complainant on learning that the Obion County Board of Education was seeking means by which it might purchase tax free gasoline for the use of its school busses and other purposes incident thereto, contacted the Superintendent of Education and an arrangement was made whereby complainant leased to the said Obion County Board of Education a 12,000 gallon storage tank, being one of four located at its bulk plant at Union City, Tennessee, for $1.00 and other considerations. Complainant agreed to procure gasoline for the said Board of Education at cost plus freight, storing same in the leased tank, and to deliver it on the orders of the Superintendent of Education at a charge of two cents per gallon for such delivery. On receipt of an order from said Board of Education complainant would order a car of gasoline from the Shell Petroleum Corporation to be shipped to Obion County Board of Education, and the gasoline would then be shipped by the Shell Petroleum Corporation from its Wood River Refinery in the State of Illinois, consigned to Obion County Board of Education and invoiced 'sold to' Tennessee Oil Corporation, Dyersburg, Tennessee, and 'shipped to' Obion County Board of Edu-

cation. Said gasoline when received was stored in the leased tank.

"The complainant insisted on payment for the gasoline so shipped immediately after each car was unloaded and it billed the Obion County Board of Education for the market cost of the gasoline, freight, and delivery charges, and these amounts were paid by the said Board of Education to the complainant. The Shell Petroleum Corporation charged the gasoline to the account of the complainant and complainant paid said corporation as billed.

"It appears that no gasoline was placed in said leased tank except that shipped to the said Board of Education, and that no gasoline was sold therefrom or was delivered therefrom except that delivered as directed by the Superintendent of Education, and duplicate receipts were taken when the gasoline was delivered, one going to the office of the complainant and one to the Superintendent of Education. The proof further shows that none of said gasoline contained in said leased tank was ever inventoried as stock of the complainant company."

There was never any question on the part of the parties to the transaction that the gasoline was to be tax free and was to be brought from outside the state in interstate commerce.

The state insists that the arrangement made was in violation of a regulation promulgated by the Department of Finance and Taxation on April 16, 1931, and that because of such regulation complainant is liable for the gasoline tax on the gasoline delivered to the Obion County Board of Education. This regulation is as follows:

"Arrangements entered into between counties or cities and Distributors or Dealers in gasoline, and substitutes therefor whereunder Distributor or Dealer loans, or rents

storage facilities adjoining, adjacent to or communicating with commercial storage used by said Distributor or Dealer, or whereunder commercial delivery facilities are made available, for a fixed consideration or a consideration included in brokerage or price of gasoline, to counties or cities by Distributor or Dealer or whereunder commercial unloading facilities are made available for, or without consideration, to counties or cities by Distributor or Dealer do not constitute a substantial compliance with regulations relating to handling of gasoline and substitutes therefor in interstate commerce, and gasoline, and substitutes therefor, so handled must be included in measure of the tax levied under Chapter 58, Public Acts of 1923 and Acts amendatory.''

The chancellor found and decreed that, ''The failure to observe said departmental regulation cannot operate to make complainant liable for the tax on said gasoline while it was moving in interstate commerce, and when it came to rest it was the property of Obion County Board of Education.''

█ Counsel for the state concede that gasoline shipped in interstate commerce directly to a county or city and used by such governmental unit for governmental purposes is exempt from the gasoline tax. *State ex rel.* v. *Southern Oil Service,* 174 Tenn., 232, 124 S. W. (2d) 704; *State* v. *Hamilton County,* 176 Tenn., 519, 144 S. W. (2d), 749. But, it is insisted the gasoline must be shipped to the governmental unit and controlled by it. The determinative question is: To whom does the gasoline belong when it comes to rest in the State of Tennessee? If it belongs to the governmental unit, it is exempt from taxation. The fact that the gasoline here in question was delivered into a tank leased from complainant rather than into a tank owned by the County Board of Education is immaterial. The delivery made passed title to

692

the County Board of Education and complainant's connection thereafter with the gasoline was merely that of agent of the Board to make deliveries as directed by the Board.

██ ██ The state seeks to impose a tax on the gasoline in question, not under any right or power conferred by statute, but under the departmental regulation set out above. It has long been the rule in this state that municipal property is not taxable unless expressly made so by statute. *Smith* v. *City of Nashville*, 88 Tenn., 464, 12 S. W., 924, 7 L. R. A., 469; *State ex rel.* v. *City of Jackson*, 172 Tenn., 119, at page 124, 110 S. W. (2d), 323, and other like cases. The Obion County Board of Education cannot be indirectly taxed by the Department of Finance and Taxation through regulations. Furthermore, it is difficult to see how this regulation could deprive the gasoline in question of its interstate character.

Without further elaboration, suffice it to say that the chancellor did not err in holding complainant not liable for the tax on gasoline purchased and delivered to the Obion County Board of Education.

A majority of the court is of the opinion that complainant is liable for the tax on the gasoline sold Moody and Browder. The result is that the decree of the chancellor is reversed as to the tax on the Moody and Browder gasoline and affirmed as to the tax on the gasoline purchased by the Obion County Board of Education. The costs of the cause will be paid one-half, each, by complainant and defendant.

MAJORITY OPINION ON TAXATION OF EXPORT GASOLINE.

MR. CHIEF JUSTICE GREEN delivered the majority opinion of the Court on the taxation of export gasoline.

The majority of the Court do not concur in the chancellor's construction of Code Section 1140 as amended by section 13 of chapter 130 of the Acts of 1933. This construction relieves complainant of liability for tax on gasoline sold to Moody and Browder.

Without question these sales were made, properly passed, and there was delivery to the buyers in Tennessee.

The complainant was a distributor of gasoline, as that term is defined in Section 1126 of the Code and was liable for the tax upon the gasoline sold to Moody and Browder unless relieved by the exemption contained in section 13 of chapter 130 of the Public Acts of 1933. Unless this section is applicable to the transactions the gasoline sold to Moody and Browder should clearly be included in the measure of complainant's tax.

Section 13 of chapter 130 of the Acts of 1933, carried into Williams' Code at Section 1140 and in Michie's 1938 Code at Section 1140, is as follows:

"Sec. 13. Be it further enacted, That Section 1140 be amended by striking out said Section and substituting in lieu thereof the following:

" 'Gasoline or distillate not previously the subject of an original sale in this State, stored in this State for export to points outside the State, shall not be included in the measure of the tax liability of any distributor or dealer; provided that such gasoline or distillate is stored in a separate tank marked "export tank";

" 'Provided that a bond is executed by the distributor or dealer that in the opinion of the Commissioner of Finance and Taxation adequately protects the State against loss of tax in case said gasoline or distillate is not subsequently exported outside the State;

" 'Provided that gasoline or distillate stored for export longer that a period of sixty days must be included in the

measure of the tax liability of the distributor or dealer so storing such gasoline or distillate.' "

■ By this 1933 amendment the distributor is relieved of the tax on gasoline stored for export in designated tanks and exported within sixty days from the date of storage. This exemption is granted to a distributor as to the gasoline he exports within the statutory period. It is not granted to the distributor as to the gasoline he sells and delivers in this State, even though that gasoline be sold for export.

To export means to carry or to send abroad. *Webster's International Dictionary*; *Thompson* v. *United States*, 142 U. S., 471, 12 S. Ct., 299, 35 L. Ed., 1084. A distributor does neither when he sells and delivers at his place of business in this State.

A case in point is *A. G. Spalding & Bros.* v. *Edwards*, *D. C.*, 285 F., 784, 785. In that case a manufacturer of sporting goods in New York sold certain baseball bats and balls to a commission house in the same city for export to a business firm in Venezuela. The manufacturer marked the goods for export, delivered them to the export carrier, taking a receipt which it delivered to the purchaser, who made payment. The internal revenue collector demanded the sales tax imposed by the current Act of Congress, Oct. 3, 1917, sec. 600, 40 Stat., 316. The tax was paid under protest and the manufacturer sued for its recovery, relying on the provision of Section 9 of Article 1 of the Federal Constitution reading, "No Tax or Duty shall be laid on Articles exported from any State." The suit was dismissed. Among other things the Court said:

"Here, however, the sale was wholly made and consummated within the United States; the only part played by plaintiff in the actual export movement was that at

the request of its purchaser it marked and delivered the goods to the steamship company. So far as plaintiff was concerned, the merchandise might have been removed from the carrier's custody by Scholtz & Co. and resold within the United States. The reason for this was that no actual export movement on the part of plaintiff was ever begun.''

In the case before us the complainant contributed nothing to the transaction in the way of export movement. The gasoline was delivered to the buyers' trucks at the complainant's place of business and the movement was wholly instituted and controlled by the buyers.

A comparison of the original Code, Section 1126 and 1140 with the amendments to those sections enacted by chapter 130 of the Act of 1933 strengthens the view indicated. The second paragraph of Section 1126 of the Code is in these words:

''The term 'distributor' means and includes every person who engages in the business in the state of refining, manufacturing, producing, or compounding gasoline or distillate, and selling the same in this state; and also every person who engages in the business in this state of shipping, transporting, or importing any gasoline or distillate into, and making original sales of the same, in this state.''

Section 1140 of the Code reads as follows:

''None of the provisions of this statute shall apply to the sales of gasoline or distillate when sold for, and exported out of the state.''

It will be noted under these two Code sections that gasoline sold for export was not included in the measure of the distributor's tax liability. By the second paragraph of section 1 of chapter 130 of the Acts of 1933, Section 1126 of the Code was amended by adding to the

definition of distributor one making original sales in this State "for any purpose whatsoever." In section 13 of chapter 130 of the Acts of 1933, amending Section 1140 of the Code, the exemption was accorded to gasoline "stored in this State for export" and subsequently exported, not as in original Code, Section 1140 to gasoline "when sold for [export], and exported out of the state."

It seems to us that these amendments were made by the Act of 1933 to meet the construction of the statute upon which the complainant insists.

It should be noticed that the judgment of the District Court in *A. G. Spalding & Bros.* v. *Edwards, supra,* was reversed by the Supreme Court in 262 U. S., 66, 43 S. Ct., 485, 486, 67 L. Ed., 865. Since we are construing a statute of this State, the decision of the one Court no more than the other is binding upon us and we like the reasoning of the District Court. Things upon which the Supreme Court based its decision in the Spalding case do not appear in the case before us. There the dealer marked the goods for export, delivered them to an export carrier, and took a bill of lading. Here delivery was made of the gasoline to the buyers' trucks at the distributor's place of business, just as delivery would have been made to any buyer using or vending the gasoline in Tennessee. There the Supreme Court refers to any exercise of the purchaser's right to remove the goods from an export movement as a theoretical possibility and said there was not "the slightest probability of any such change." Here experience with fraudulent gasoline tax evasion has demonstrated that there is great probability of diversion from *bona fide* export in transactions such as these. There the Supreme Court followed the rule of liberal protection for exports. Here

we must follow the rule of strict construction of tax exemptions.

The amendments of the gasoline tax laws heretofore set out enacted in 1933, as we have said, very plainly show that it was not the intention of the lawmakers to exempt from the measure of the distributor's tax liability gasoline handled as was the gasoline sold to Moody and Browder.

McKinney & Chambliss, JJ., concur in this opinion.

DISSENTING OPINION.

MR. SPECIAL JUSTICE PREWITT (dissenting).

This suit was filed by the Tennessee Oil Company, with its principal office at Dyersburg, to recover gasoline taxes paid under protest in the sum of $25,510.51. This amount included four items of tax, only two of which are involved in this appeal. At the trial before the chancellor, the commissioner conceded that complainant was entitled to recover the taxes set forth in the original bill as Schedules 2, 5, and 6, in the sum of $95.04, $175 and $408.63, respectively, and no appeal was taken from this part of the decree.

E. R. Moody was, at the time of these sales, a resident of Eloise, Dyer County, Tennessee. He operated stations for the retail sale of gasoline at Eloise and Midway in Dyer County. He also operated a retail sale station at Cottonwood Point in Missouri. Moody operated a bus service from Dyersburg to Eloise and used Shell Gasoline purchased from the Tennessee Oil Company, the same brand purchased for alleged export to Missouri. Moody purchased all of his gasoline from complainant, including "tax free" gasoline, on open account. All

gasoline purchased by him was carried by complainant on one account, which was payable monthly. No tax was paid on this gasoline either by Moody or the oil company. A tax of two cents was paid on it in Missouri.

The section of the Code involved (1140, as amended) is as follows:

"Gasoline or distillate not previously the subject of an original sale in this State, stored in this State for export to points outside the State, shall not be included in the measure of the tax liability of any distributor or dealer; provided that such gasoline or distillate is stored in a separate tank marked 'export tank'; Provided that a bond is executed by the distributor or dealer that in the opinion of the Commissioner of Finance and Taxation adequately protects the State against loss of tax in case said gasoline or distillate is not subsequently exported outside the State; Provided the gasoline or distillate stored for export longer than a period of sixty days must be included in the measure of the tax liability of the distributor or dealer so storing such gasoline or distillate."

The position of the state as to the so-called export gasoline is set forth by R. L. Weakley, the director of Gasoline Tax and Oil Division of Tennessee. He says:

"Q. In other words, if the distributor carries it out himself, or ships it out by carrier, it is all right; but if a man comes in and buys it and comes and gets it himself, the tax has to be paid on it, irrespective of the fact whether you know it went out of the state or not; is that right? A. Yes, that is right.

"Q. In other words, if you knew definitely that it had gone out of the state, but had been hauled by the man's own truck, you would still hold him for taxes? A. Yes, under the regulations."

There were no written regulations; but this was, in fact, a custom.

There is no contention by the State that it lost any revenue by the gasoline exported to Browder. On the contrary, the trucks were checked and they corresponded in amount to the gasoline reported as export. This was also the situation with respect to the gasoline sold to Moody and hauled to Missouri and the tax there paid.

It seems to be argued that after the words in the first paragraph of the statute "stored in this State for export" should be added the words "and that is to be carried or sent by the oil company" to points outside the state, etc. In other words, the State contends that in order for the exported gasoline to be free from the tax it must be carried or sent across the state line by the oil company.

The writer cannot agree with this contention. The statute does not so state, and this should not be read into the statute. This is a matter of legislative concern. This very thing was contemplated when the very next paragraph of the law provided for the execution of a bond to protect the state "against loss of tax in case said gasoline or distillate is not subsequently exported outside the State."

Had such a situation as the State contends been contemplated, the legislature could have easily added, after the words in the second paragraph "subsequently exported outside the State," the words "by the oil company or its agent."

No construction of a statute is necessary if the language creates no doubt of the legislature's intent. *State* v. *Howard*, 139 Tenn., 73, 201 S. W., 139; *Hickman* v. *Wright*, 141 Tenn., 412, 210 S. W., 447.

Words are to be used in their natural and ordinary sense. *Sanford Realty Co.* v. *City of Knoxville,* 172 Tenn., 125, 110 S. W. (2d), 325; *Tobin, Commissioner,* v. *Estes,* 168 Tenn., 403, 79 S. W. (2d) 550; *Hedges* v. *Shipp,* 166 Tenn., 451, 62 S. W. (2d), 49.

There must be some ambiguity arising from the words used, or the different sections of the Act, or there is no need for construction, and the person asking for construction must point out the ambiguity. *Mathes* v. *State,* 173 Tenn., 511, 121 S. W. (2d), 548; *Hickman* v. *Wright,* 141 Tenn., 412, 210 S. W., 447.

The active loss of revenue will not justify the alteration of the clear terms of the Act.

It is incumbent on the dealer to show that the gasoline is exported.

The original sale is to be made for export. One cannot buy gasoline from a dealer and subsequently sell for export, for it would not be gasoline ''not previously the subject of an original sale in this State.''

For the reason given, the writer is of the opinion that the decree of the chancellor was correct and should be affirmed, and therefore respectfully dissents from the majority opinion.

## On Petition to Rehear.

Mr. Chief Justice Green delivered the opinion of the Court.

Responding to the petition, we find no error in the statement of the majority opinion that the sales involved ''were made, property passed, and there was delivery to the buyers in Tennessee.''

The petitioner does not distinguish between a contract to sell and a sale. Doubtless there was a contract to sell

part of the goods entered into in Kentucky. It was, however, a sale of unascertained goods and the transfer of property was in Tennessee. Certainly there was no transfer of property to Browder until the gasoline was removed from petitioner's place of business in Dyersburg and placed in the tanks at Union City.

 The foregoing, however, is immaterial because the tax here involved is not a sales tax but a tax on the storage of the gasoline.

 The proposition urged in the petition for rehearing is that the gasoline with respect to which the tax here was collected was in interstate commerce while in Tennessee, and that the construction given by this Court to section 1140 of the Code, as amended by chapter 130 of the Acts of 1933, brings the statute into conflict with the Commerce Clause of the Constitution of the United States, Article 1, Section 8.

Petitioner also insists that the construction given the statute brings it in conflict with Section 1 of the Fourteenth Amendment of the Constitution of the United States and Section 8 of Article 11 of the Constitution of the State of Tennessee.

This case was presented on the hearing by the late Mr. Charles M. Bryan of Memphis—an able and extremely careful lawyer. He was doubtless of opinion that the recent decisions of this Court in *Texas Co.* v. *McCanless, Commissioner*, 177 Tenn., 238, 148 S. W. (2d), 360; and *State* v. *Standard Oil Co. of Louisiana*, December Term, 1940,[1] resolved the constitutional questions against him. The latter case was affirmed by the Supreme Court of the United States, 314 U. S., 573, 62 S. Ct., 112, 86 L. Ed., —.

---

[1]Not designated for publication.

In argument and in their brief filed in this Court on the hearing, petitioner's counsel raised none of the constitutional questions now brought forward but, almost in as many words, waived those questions.

In the assignments of error and brief filed for the State there was some argument and citation of authority tending to show that the gasoline involved had passed out of interstate commerce and had come to rest in Tennessee. Counsel for the petitioner, the appellee then, opened the brief with this statement:

"The two questions involved in this case are, we insist, when simply stated, almost self-responsive.

"Opposing counsel as to the first issue has confused the rights of a taxpayer arising under the Commerce Clause of the United States Constitution with the classification of property for taxation provided by Section 1140 of the Code, as amended. We are concerned here only with the meaning of that section, and therefore the first issue is as follows:

"1. When Section 1140 of the Code, as amended, provides that gasoline 'stored for export' and 'subsequently exported outside the State' shall not be taxed, can there be read into the statute a proviso that this freedom from taxation can arise only when the 'export' is made by a conveyance not owned by the purchaser.

"Or, to state the issue with the insertion in appellant's statement of the words which make the question arise from the established facts:

"1. When an oil company stores gasoline for export in accordance with the provisions of Code Section 1140, and sells and delivers for export to a customer in Tennessee, and the gasoline is forthwith 'exported out of the state' by the customer in the same truck into which

the gasoline was delivered, is such gasoline subject to the State gasoline tax.''

The brief then goes on to state the second issue, but that matter was decided by this Court in favor of the appellee, petitioner now.

Further in the brief submitted on the original hearing, referring to an argument of the State, counsel for petitioner said this:

''It is apparently claimed that if the gasoline sales were not in interstate commerce they were not 'exports,' and certain cases from the Supreme Court of the United States are cited upon the question of what is interstate commerce. These cases while very persuasive upon the point to which they are cited, we earnestly insist, have nothing to do with the instant case.''

There was no reference in the opinion of the Court to the constitutional questions now brought up. An examination of the opinion of the chancellor does not indicate that any of these questions were submitted to him. Such being the plight of the case, under well settled practice, we can not undertake to pass on these matters now.

This Court will not grant relief that was not asked nor granted below and was sought for the first time on petition to rehear. *Nashville* v. *Wilson*, 88 Tenn., 407, 12 S. W., 1082.

Such is the rule in the trial courts. A new trial will not be granted to enable a defendant to avail himself of the matter which he might have presented on the trial but raised for the first time on his motion for a new trial. *Heggie* v. *Hayes*, 141 Tenn., 219, 208 S. W., 605, 3 A. L. R., 150.

We think a rule similar to that announced in *Nashville* v. *Wilson, supra,* with respect to petitions for rehearing, prevails in appellate courts quite generally.

"In, civil cases it is a well-recognized rule that questions not advanced on the original hearing will not be considered on petition for a rehearing. This must necessarily be so, because if new questions could be raised on a rehearing, there would be no end to a case on appeal or error. This rule is especially applicable in the case of a question as to the constitutionality of a statute." 3 Am. Jur., 350.

"As a general rule a rehearing cannot be had on account of matters or questions different from those urged at the original hearing by the party seeking the rehearing; and points which have been waived on the hearing, either expressly or by implication will not be considered on a petition for a rehearing." 4 C. J. S., Appeal and Error, sec. 1421, p. 2032.

In support of the texts above quoted numerous decisions are cited from the various appellate courts, which decisions well support the rule stated.

Petition to rehear is denied.